Filed 6/13/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| LYNNE FRANCIS BRUNO, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> JANE FRANCIS HOPKINS, Individually and as Personal Representative, etc., et al., <br><br> Defendants and Respondents. | H044960 <br> (Santa Clara County <br> Super. Ct. No. 2015-1-PR-176711) |

Appellant Lynne Francis Bruno filed suit against her mother, Mildred Francis, individually and as trustee of a family trust,[1] as well as two of her sisters, respondents Jane Francis Hopkins and Gwen Francis (collectively Respondents), alleging that they forged trust instruments purporting to divide her parents' estate upon the death of her father. Following a court trial, the trial court entered judgment in favor of Respondents after determining the trust instruments were not forgeries. On Respondents' motion for attorneys' fees, the trial court ordered Lynne to pay over $829,000, finding there was no merit to the position Lynne pursued at the trial, and that Lynne "acted without basis in

---

[1] Mildred Francis passed away after the initial notice of this appeal was filed. This court granted an order substituting Jane Francis Hopkins, Personal Representative of the Estate of Mildred Francis and trustee of the Francis Living Trust dated March 22, 1991, in this matter for Mildred Francis, individually and as trustee.

filing any of her claims."[2]  In addition, the court ordered Lynne to pay over $96,000 in costs.

On appeal, Lynne contends the trial court issued the attorneys' fees order in error. She alleges the trial court lacked jurisdiction to grant a fee award against her because she did not own any actual interest in the trust assets.  She further contends that because she had a reasonable and good faith belief in the merits of her claim, there was insufficient evidence to support the issuance of the fee award.  Asserting that the record does not support a finding that she pursued her claims in bad faith, Lynne also claims that the trial court erred when it granted an award of costs to Respondents.  Finding no error, we affirm the judgment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The trial court held a 13-day court trial on the bifurcated issue of whether the trust instrument at issue was invalid as a forgery.  After the trial court found that the trust instrument had not been forged, it heard Respondents' motion for attorneys' fees, and considered the memorandum of costs offered by Respondents, as well as Lynne's motion to strike or tax costs.  In ordering Lynne to pay fees and costs, the trial court indicated it considered the evidence from the trial proceedings in addition to the parties' pleadings.[3] We glean the following evidence relevant to the attorneys' fees and cost orders from the record created during the trial regarding the validity of the trust instrument.

---

[2] As several of the parties and lay witnesses share the same last name, we will refer to them by their first names.  We refer to non-family and expert witnesses by their surnames.

[3] At the trial, the court heard testimony from Lynne and her husband, William Bruno, Jane and her husband, James Hopkins, Gwen, Stephen Wurzburg, an attorney who did work for James Francis's employer, as well as expert witness testimony from Lloyd Cunningham, William J. Flynn, David S. Moore, Valery Aginsky, and Albert Lyter.  In addition, the court viewed the videotaped depositions of Mildred and Gail Francis Seig, Mildred's eldest daughter, in lieu of live testimony.

2

## A. Creation of the Trust

Mildred was married to James Francis for 67 years. Together they had four daughters (listed in order from oldest to youngest): Gail, who is not a party to this action, Lynne, Jane, and Gwen. Jane and Gwen lived in California and testified that they had a close relationship with their parents. Lynne and Gail each moved to Pittsburgh, where they lived during the time relevant to this appeal. Mildred testified that Lynne's visits after Lynne moved to Pennsylvania were often unpleasant.

Between 1989 and 1991, James and Mildred created an estate plan, resulting in the creation of The Francis Living Trust (the Trust), as well as a last will and testament for each of them. James was an attorney and drafted the documents himself. He handwrote portions of the documents, while others were prepared by various people James employed to type parts of the estate planning documents. The final document consisted of 31 pages. The date the Trust was created was handwritten on the first page, and Mildred and James signed the last page, as did the notary who witnessed their signatures. The remainder of the document was typewritten.

Under the terms of the Trust, upon the death of the first spouse, half of the Trust assets would be allocated to a revocable surviving spouse's trust, and the other half of the assets would be placed in an irrevocable marital trust and an irrevocable family trust. The Trust specified that Lynne and Gail would each receive $200,000 from the revocable surviving spouse's trust, with the remaining assets to be divided equally between Jane and Gwen, after other specified distributions were made. In his will, James indicated that the residue of his estate would be given to Mildred, as trustee of the Trust, subject to her ability to revoke the surviving spouse's trust.

Mildred testified that at the time she and James prepared the Trust, the $200,000 gifts to Lynne and Gail represented about half of the Trust assets. The parents were concerned because Lynne and Gail did not have careers and would thus benefit from receiving a designated amount of money, while Jane and Gwen could rely on their own

3

"lucrative careers" for financial stability. Mildred noted that Jane and Gwen would not have fared well had she and James passed away shortly after creating the estate plan. As time passed, James and Mildred took steps that reflected their intent to leave the bulk of their estate to Jane and Gwen. In 2003, the parents gifted their shares of James's employer's stock to the two younger daughters. In the intervening period between the creation of the Trust and James's death, the value of the Trust estate grew, such that the $200,000 gifts to Lynne and Gail no longer amounted to half of the Trust assets. At the time she commenced her proceedings in the trial court, Lynne estimated the value of the Trust assets was $4-5 million.

## B. James's Death and Subsequent Events

James was hospitalized in 2006 after suffering a stroke. Lynne and Gail returned to the family home in California upon learning of James's hospitalization. While staying at her parents' home, Lynne alleged that she found one of her father's estate planning documents in an unlocked metal box in the kitchen. She "perused" the document, but did not recall the title of the document, the number of pages, or whether she saw James's signature on the document. Lynne testified that she saw her mother's and sisters' names, and noted that the document indicated the four children would receive equal shares of their father's estate.

Lynne testified that Mildred and James had not discussed the details of their estate plan with her. She stated that she was purposely trying to find a will or trust because Mildred had told her one had been created. She did not ask Mildred or James for permission to look through their financial documents. She did not discuss the document she saw with her mother or sisters. She testified that she attempted to keep her review of the metal box and its contents secret from Mildred and only discussed it with her husband. In addition to allegedly seeing estate planning documents, Lynne also testified that while she was at her parents' home she viewed records related to Mildred's stock transactions.

Mildred testified that only she and James knew the location of the Trust documents—a locked safe or crawlspace—and she denied that Lynne could have seen the documents, or any copies of them, in a box in the kitchen. Mildred located the Trust instruments in a crawlspace in a guest room closet more than a month after James's death. Mildred and James did not share the location of the documents with their children.

James passed away shortly after midnight on May 12, 2006. Following the funeral, the family returned to Mildred's home and gathered on the patio. At some point, Lynne retreated to a bedroom. When Gail went to check on her, Lynne was angry, and stated that her husband would hire an attorney if Lynne did not get "her fair share. . . ."

Gail and Lynne discussed their parents' estate plans at least two other times prior to 2015. At some point after both women had returned to Pittsburgh, Lynne told Gail during a telephone conversation that "she thought [James's] will should have been read." Gail also testified that in late 2013 or early 2014, Lynne told her that Gail would receive only $200,000 from their parents' estate, with the remainder to be divided between Lynne, Jane, and Gwen. Lynne claimed Mildred had told her this. Gail believed Lynne was trying to create division within the family. Gail claimed Lynne offered to give Gail part of Lynne's share of Mildred's estate. In her own testimony, Lynne stated that Mildred told her in the fall of 2006 that Gail would receive a set amount and the other three daughters would split the remainder of the estate. Mildred denied having this conversation with Lynne.

## C. Notification of the Trust

Upon James's death in 2006, Mildred became the sole trustee of the Trust. Mildred waited until 2015 to authorize Jane to prepare the notification required when a revocable trust becomes irrevocable by the death of one or more settlors of the trust under

Probate Code section 16061.7, subdivisions (a)(1), (b)(2), and (f).[4] Lynne received the notice in early February 2015. Mildred suffered a stroke shortly after sending the required notification. Lynne testified that the timing of Mildred's stroke relative to the sending of the required trust notification, as well as phone calls Lynne had with Mildred and with Jane's husband, raised Lynne's suspicions, prompting Lynne to request a copy of the Trust.

With Jane's input, in March 2015 Mildred provided Lynne with the portion of the Trust documents containing only the irrevocable provisions of the Trust. In response, Lynne asked for a complete copy of the Trust instrument, as well as information about the Trust assets. Lynne was informed in a conversation with Jane and in a subsequent letter from Mildred that she would receive $200,000 from the estate. When she again requested a complete copy of the Trust instrument, she claimed Mildred told her she would not receive any additional information. When Lynne retained counsel, Mildred's attorney provided Lynne's attorney with a copy of the Trust and James's will.

### D. Trial Court Proceedings

Shortly before receiving the Trust and will from Mildred's attorney, Lynne filed a petition to compel the production of the Trust instrument and James's will. After receiving copies of the estate planning documents, Lynne retained expert David Moore, whose review of a copy of the Trust revealed differences between the first and last pages and the remaining pages. Moore recommended that Lynne's attorney obtain the originals for him to review.

Before Moore could conduct such a review, Lynne amended her petition, adding causes of action to remove Mildred as the trustee, and to declare the Trust instrument a

---

[4] Relevant to these proceedings, when a revocable trust becomes irrevocable by the death of one or more settlors of the trust, the trustee is required to serve notice of the settlor's death on each heir of the deceased settlor not later than 60 days after the settlor's death. (Prob. Code, § 16061.7, subds. (a)(1), (b)(2), & (f).)

6

forgery, among other bases for relief. Lynne alleged that Mildred waited nine years after James's death to comply with Probate Code section 16061.7 to notify Lynne of the existence of the Trust. Mildred then resisted Lynne's attempts to obtain a complete copy of the Trust instrument, prompting Lynne to file her petition to compel production. Asserting that the provision of the Trust limiting Lynne's potential receipt of assets to $200,000 was inconsistent with her relationship with James and the estate planning instrument Lynne alleged she saw shortly before James's death, she contended that the copies of the Trust and James's will provided to her were forgeries. In seeking to remove Mildred as trustee, Lynne alleged Mildred breached numerous fiduciary duties by failing to timely serve the section 16061.7 notification, failing to provide a complete copy of the Trust upon Lynne's request, and by "forging and producing forged copies of the Trust instrument and James'[s] Will."

Respondents opposed Lynne's amended petition, denied the allegations of forgery and sought an award of attorneys' fees. Although not a party to the action, Gail provided a declaration in opposition to the amended petition, stating she did not believe that her mother or sisters falsified any documents. Gail later testified that all three sisters were "astonished" by Lynne's allegations.

The trial court granted Mildred's unopposed motion to bifurcate the cause of action seeking to invalidate the Trust instrument on the basis that it was a forgery.

### E. Expert Testimony

In addition to lay witnesses, who testified as described above, each party called expert witnesses to address whether the Trust documents were forgeries. Lynne called forensic document examiners Cunningham, Moore, and Flynn, as expert witnesses in her case in chief. These experts opined, based on their respective analyses of the Trust instrument, that pages 2 to 30 of the 31-page Trust instrument differed from pages 1 and 31 as follows: they were written on different paper; they had different typography characteristics (i.e., font, line spacing, and interparagraph spacing); they had inconsistent

7

numbers of staple holes, suggesting pages had been removed and replaced or inserted at a later time; and they had more disturbed paper fibers, including disturbances that would not have been caused by accident, storage conditions, or normal wear and tear. Pages 1 and 31 of the Trust contained "original handwriting," while the internal pages did not.

Cunningham and Moore each opined that someone had altered pages 2 through 30 of the Trust instrument in an attempt to artificially age the pages, by applying an unidentified stain or solution and randomly rubbing and scraping the pages. The bases for their opinions differed. Cunningham found fiber disturbances on only the back side of the contested pages, while Moore found disturbances on the front and back of all pages, including the first and last page of the Trust instrument. Cunningham believed someone had used an instrument to apply the staining agent, which disturbed the paper fibers; Moore said the pages had been submerged in the staining agent, and the disturbances occurred when the forger attempted to remove remnants of the agent. Neither expert could identify the staining agent. Flynn opined that pages 2 to 30 were created at a different time and with a different word processing system than pages 1 and 31.

In evaluating the original Trust instrument, Cunningham stated that he found "microscopic, hard, physical remnants of a solid material that were stuck to some paper fibers," which were "very fragile." Believing that the substance "could very well have been very critical evidence in the case," Cunningham preserved these pages in plastic sheet protectors. He then asked Flynn to examine the typography of the documents, cautioning Flynn that there was "very, very fragile evidence affixed to some of the pages. . . ." Flynn testified that Cunningham told him he had observed paper fiber disruption on the back of the pages, and wanted Flynn to prepare photo micrographs. Flynn testified that Cunningham's statements did not influence his ultimate opinion in the case.

8

Respondents called Lyter, a "forensic chemist specializing in the examination of questioned documents." Lyter found that two types of toner were used to print the Trust documents. However, Lyter opined that both types of toner used on the Trust documents were of a size that was commonly used in 1991, rather than the toner used in 2006 or 2015, which had smaller particles. Lyter did not agree that pages of the Trust had been stained; rather, he contended that some of the pages were printed on different paper stock, all of which was at least 20 years old. He found no evidence that the documents were prepared at a different time than the date indicated on the documents. As for the concerns regarding disturbances to the paper fibers, Lyter testified that the majority of the pages in the Trust documents were uncoated and made from soft wood pulp; such paper is more susceptible to fiber disturbances than coated paper or paper made from hard wood pulp. He opined that the disturbances were consistent with normal wear and tear.

Lynne then called Aginsky, a forensic chemist specializing in forensic document examination, as a rebuttal witness. Moore had recommended that Lynne retain Aginsky to test stains on the documents to determine the composition of the stains. During his testimony, Moore indicated that Lynne's attorney had told him Aginsky ultimately did not do any testing to determine the composition of the stain, because Aginsky "didn't feel qualified to do that testing." Cunningham similarly testified that Lynne's attorney informed him Aginsky declined to examine the staining because it was "beyond the scope of his ability as an ink chemist." Neither Moore nor Cunningham ever learned if the attorney's statements to them were true. When called to testify, Aginsky indicated he did test the Trust documents, using the same method as Lyter, in an effort to identify a staining agent, if any, and he did not find the presence of "any extraneous staining agent."

### F.  Ruling on Petition and Motions for Attorneys' Fees and Costs

The court issued a statement of decision finding that Lynne did not meet her burden of proof and that she should take nothing by way of her petition. The trial court indicated that it "did not find Lynne to be credible or her contentions . . . to be true,"

9

noting that Lynne could not recall details about the document she allegedly saw dividing her parents' assets equally amongst the children. The fact that James had gifted stock to Jane and Gwen during his lifetime without making similar gifts to his other children undermined Lynne's claim that James would have equally divided his estate amongst his four daughters. The court determined Mildred was the "most credible and honest witness," who provided a "reasonable and credible" explanation of why she and James planned their estate as they did, and whose testimony that the Trust documents were the "true original documents that [James] drafted" was "honest." The court determined Jane, her husband, and Gwen, were also credible witnesses. Based on their testimony, the trial court found it "unrealistic" to think Mildred would betray James's wishes, and noted Lynne had not produced credible evidence of nefarious intent on Jane or Gwen's part.

With regard to the expert testimony, the trial court found that the fact Cunningham placed several of the pages of the Trust into plastic protective sheets and communicated to other experts his belief that the evidence contained therein was significant constituted a "[veiled] attempt to influence the other experts." That Aginsky did not find the spots worth testing, combined with his inability to conclude that someone applied a staining agent to the Trust documents, caused the trial court to question the expertise and credibility of both Cunningham and Moore. Because "none of the experts could identify with certainty how the staining was accomplished, the type of staining agent that was used, or show that a staining agent was actually applied to the paper, the court [found] no merit to [Lynne's] experts' theory that the pages of the Trust Instrument were replaced, artificially aged or otherwise tampered with." Rather, the trial court found credible Mildred's testimony that James used different typists to assist in preparing the documents, and thus found it reasonable that the different typists would use different paper, font, and toner. The court believed Mildred's testimony explained other anomalies in the document as well.

10

The court entered judgment in favor of Respondents against Lynne and adopted its final statement of decision. Following the entry of judgment, Respondents filed a motion for attorneys' fees in which Mildred asked for $331,274, and Jane and Gwen asked for $497,762.50. Asserting that Lynne had filed her petition to remove Mildred as trustee in bad faith, Respondents brought the motion under the court's "broad" equitable powers, as well as Probate Code section 15642, subdivision (d),[5] and Code of Civil Procedure, section 2033.420.[6]

Lynne argued that the evidence presented at trial did not support an award of attorneys' fees, contending that she made her claims in good faith. She claimed that Hicks, an expert retained by Respondents but not called at trial, agreed that portions of the Trust instrument may have been altered and she attached portions of his deposition testimony to her response. She noted that Probate Code section 15642 permits the removal of a trustee "where a trustee is unfit, fails to act, or has committed a breach of trust. [Citation.]" She argued that even if the court determined Lynne brought the action in bad faith, "legal fees could only be charged against Lynne's 'trust share.' "

In reply, Respondents contended that the statutory authority they relied on in their motion did allow the court to order Lynne to pay fees personally, rather than solely from her share of the Trust assets. In support of their contention that the evidence supported a

---

[5] "If the court finds that the petition for removal of the trustee was filed in bad faith and that removal would be contrary to the settlor's intent, the court may order that the person or persons seeking the removal of the trustee bear all or any part of the costs of the proceeding, including reasonable attorney's fees." (Prob. Code, § 15642, subd. (d).)

[6] "If a party fails to admit the genuineness of any document or the truth of any matter when requested to do so under [Chapter 16 of the Civil Discovery Act], and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees." (Code Civ. Proc., § 2033.420, subd. (a).)

11

bad faith finding, Respondents argued that Hicks's opinion had been tainted due to his friendship with Lynne's expert, Cunningham, and "the efforts made by [Cunningham and Lynne's attorney] to interfere with [the expert's] opinions." In the portions of the deposition testimony cited by Respondents, Hicks indicated that Cunningham communicated his opinions to Hicks while the case was pending, an uncommon occurrence amongst experts on different sides of a case. Prior to Hicks's deposition, Lynne's attorney copied Hicks on a letter stating Cunningham and Moore's opinions that the Trust instrument had been tampered with and that evidence had been manufactured.

Jane and Gwen filed a memorandum of costs, claiming $73,238.20 in recoverable costs. In response, Lynne filed a motion to strike or tax costs, arguing in relevant part that she had a reasonable basis to bring her litigation.[7]

Following a hearing at which the attorneys presented argument, the trial court granted Respondents' request for attorneys' fees, "for the reasons described by the Court on the record." It found that there was "no merit in the position that Petitioner pursued throughout the trial. She acted without basis in filing any of her claims. There was no support for her claims that the trust declarations had been forged, aged or substituted." Rather, the court determined Lynne's "litigation was a personal attack on her mother and her sisters by filing her lawsuit because she thought she should receive more of her parents' estate upon her mother's passing." While the trial court did not specifically address Probate Code section 15642, subdivision (d) or Code of Civil Procedure, section 2033.420, the court stated it found "merit to the position stated in the moving papers," and therefore granted Respondents' attorneys' fees motion.

At the hearing on Lynne's motion to strike or tax costs, the trial court confirmed that it had already found no merit to her claims that the Trust document had been forged

---

[7] The record on appeal includes only the memorandum of costs filed by Jane and Gwen. The motion to tax costs, and the subsequent order, references costs claimed by Mildred as well. Mildred's memorandum of costs is not included in the record.

or substituted. It determined that Lynne's suit "was frivolous and without merit," and that "justice require[d] that costs be awarded." The court then heard argument and made rulings concerning the amount of costs that should be awarded. The trial court thereafter issued a written order granting Lynne's motion to strike costs in part, reducing the amounts owed both to Mildred and to Jane and Gwen. The court determined Lynne owed Mildred $27,035.89 in costs, and owed Jane and Gwen $69,218.20 in costs.

The trial court issued an amended judgment which included the specific amounts Lynne owed to respondents for attorneys' fees and costs. Lynne timely filed a notice of appeal of the amended judgment and the order on the motion to strike costs, appealable under Code of Civil Procedure section 904.1, subdivision (a)(1).

## II. DISCUSSION[8]

### A. *Attorneys' Fees*

Lynne argues that the trial court erred when it ordered her to pay attorneys' fees in excess of the value of her potential share in the Trust assets. She contends the trial court's jurisdiction was limited to the property of the Trust estate, such that she could not be personally liable for any amount of attorneys' fees over and above her interest in the Trust. Lynne further asserts the trial court erred when it found that she instigated the litigation in bad faith, or that she otherwise lacked reasonable grounds to believe she would prevail on her claim that respondents forged the Trust documents. We find no merit to these contentions and affirm the trial court's order.

*1. The trial court had jurisdiction to award attorneys' fees in the amount ordered.*

Lynne contends that the trial court's jurisdiction in an action concerning a trust is limited to the assets of the trust. Because Lynne's potential interest in the Trust was

---

[8] On appeal, Lynne addresses only the propriety of the attorneys' fees and costs awards, not the trial court's entry of judgment in Respondents' favor, or the orders denying her motion for new trial and motion to strike related to the motion for new trial. As such, we will address only the attorneys' fees and costs issues.

13

contingent, and could be revoked or amended by Mildred at any time prior to her death, Lynne argues that she effectively had no interest in the Trust.[9]  She thus asserts that the trial court erred when it ordered her to pay attorneys' fees that would be paid from her personal assets, rather than her interest in the Trust.  Thus, we first consider whether the trial court had jurisdiction to order Lynne to pay attorneys' fees in an amount over and above her potential interest in the Trust.

Respondents set forth three grounds for their request for attorneys' fees, specifically, the court's "broad" equitable powers, Probate Code section 15642, subdivision (d), and Code of Civil Procedure, section 2033.420.  While the court based its fee award on its equitable powers, it also indicated that it "finds merit to the position stated in [Respondents'] moving papers and, therefore, grants the request."  As Respondents briefed all three theories authorizing the attorneys' fees request and Lynne addressed all three in her response, if any of these support the court's jurisdiction to make the award, we will affirm the order, assuming it met any other legal requirements imposed by the statute or as prerequisites to the exercise of equitable power.  "It is a settled appellate principle that reviewing courts uphold judgments or orders if correct for any reason, regardless of the correctness of its grounds as ' " '[i]t is judicial action and not judicial reasoning which is the subject of review . . . .' " ' [Citations.]" (*Willis v. City of Carlsbad* (2020) 48 Cal.App.5th 1104, 1128, fn. 12.)

---

[9] Lynne asks this court to take judicial notice of the petition for probate of Mildred's estate, filed in Santa Clara County Superior Court case number 18PR182639, based on her claim that it is relevant to establish her actual interest in the Trust based on the terms of the last will and testament operative at the time of Mildred's death.  This document was not before the trial court at the time it entered any of the orders or judgment at issue on appeal.  Given our determination that section 15642, subdivision (d) authorizes Lynne's personal liability for attorneys' fees, her actual interest in the Trust following Mildred's death is not relevant to our evaluation.  The request for judicial notice is denied.

14

We determine that the trial court's equitable powers could not justify the attorneys' fees award. As a general matter, probate proceedings are statutory in nature, such that the trial court "has no other powers than those given by statute and such incidental powers as pertain to it and enabling the court to exercise the jurisdiction conferred upon it, and can only determine those questions or matters arising in the estate which it is authorized to do." (*Estate of Schloss* (1961) 56 Cal.2d 248, 253; accord *Estate of Ryder* (1903) 141 Cal. 366, 368.) However, the court has broad equitable powers to protect the trust estate. " ' "Courts having jurisdiction over trust administration have the power to allocate the burden of certain trust expenses to the income or principal account . . . . Sometimes this authority is stated in statutory form, but it exists as part of the *inherent jurisdiction of equity to enforce trusts*, secure impartial treatment among the beneficiaries, and to carry out the express or implied intent of the settlor." [Citation.] "Where the expense of litigation is caused by the unsuccessful attempt of one of the beneficiaries to obtain a greater share of the trust property, the expense may properly be chargeable to that beneficiary's share." [Citations.]' [Citation.]" (*Rudnick v. Rudnick* (2009) 179 Cal.App.4th 1328, 1334.)

In *Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172 (*Pizzaro*), the appellate court confirmed that "[t]he trial court's equitable power over trusts gives the court authority to charge attorney fees and costs against a beneficiary's share of the trust estate if the beneficiary . . . 'instigate[d] an unfounded proceeding against the trust in bad faith.' [Citation.]" (*Id*. at p. 185.) However, it concluded the trial court exceeded its equitable powers when it imposed personal liability for attorneys' fees and costs on a beneficiary "over and above the funds available from [the beneficiaries'] share of the trust proceeds. . . ." (*Ibid.*) The trial court has the authority "to direct that the share of the trust assets that would be distributed to an offending beneficiary would instead be used to pay attorney fees and costs to the benefit of the trust," but "[o]rdering [the beneficiaries] to potentially pay attorney fees and costs out of their own pockets is beyond the equitable

15

power of the court over trusts because the court has no equitable jurisdiction over that money." (*Id.* at p. 189.) Consistent with *Pizarro*, we conclude that the trial court here had no equitable jurisdiction to award attorneys' fees in excess of Lynne's share of the trust assets.

Having rejected the assertion that the trial court's equitable power over trusts authorized the fees award, the *Pizarro* court reversed the portion of the trial court's order making the beneficiaries personally liable for attorneys' fees and remanded the matter to the trial court to consider whether any statutory authority, including Probate Code section 15642, subdivision (d),[10] allowed for imposition of personal liability for attorneys' fees in an action against the trust. The court declined to itself consider whether any statute authorized the imposition of fees. "The trial court relied exclusively on its equitable power over trusts and did not invoke the statutory power and procedures and make the determinations under any statutory means of imposing an award of attorney fees and costs." (*Pizzaro*, *supra*, 10 Cal.App.5th at p. 190.) The matter thus was remanded without reaching the question of whether statutes such as Probate Code section 15642, subdivision (d) authorized an attorneys' fee award. (*Ibid.*)

Based on *Pizarro*, we agree that the trial court here lacked authority under equity to impose attorneys' fees and costs. Unlike *Pizarro*, as statutory grounds to award fees were addressed in the parties' papers below and the court indicated that it agreed with Respondents' position, we now consider the question that case deferred, namely, whether the language in section 15642, subdivision (d) authorizes an award of fees against a trust beneficiary in excess of their share of the trust estate.

In general we review the trial court's determinations regarding the propriety or amount of statutory attorneys' fees for abuse of discretion. However, the question here is

---

[10] Subsequent undesignated statutory references are to the Probate Code unless otherwise noted.

one of statutory construction, which is a question of law subject to de novo review.  (See *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751.)  "We begin by considering the statute's language and structure, bearing in mind that 'our primary goal is to determine and give effect to the underlying purpose of the law.'  [Citations.]  We start by considering the ordinary meaning of the statutory language, the language of related provisions, and the structure of the statutory scheme.  [Citations.]  If the language of a statutory provision remains unclear after we consider its terms, structure, and related statutory provisions, we may take account of extrinsic sources— such as legislative history—to assist us in discerning the relevant legislative purpose.  [Citations.]"  (*Gund v. County of Trinity* (2020) 10 Cal.5th 503, 511.)

Section 15642 authorizes the removal of a trustee upon the petition of a settlor, cotrustee, or beneficiary, where the trustee has committed a breach of a trust, among other specified grounds.  (§ 15642, subds. (a) & (b)(1).)  "If the court finds that the petition for removal of the trustee was filed in bad faith and that removal would be contrary to the settlor's intent, the court may order that the person or persons seeking the removal of the trustee bear all or any part of the costs of the proceeding, including reasonable attorney's fees."  (§ 15642, subd. (d).)  On its face, the ordinary meaning of the phrase "all or any part of the costs of the proceeding, including reasonable attorney's fees" suggests that the Legislature intended to authorize attorneys' fees without limiting the amount to the moving party's interest in the trust at issue.  The only limitation expressly set forth in section 15642, subdivision (d), is that the attorneys' fees be "reasonable."

Lynne argues that such an interpretation is inconsistent with the language of related statutory provisions in the Probate Code and the structure of the statutory scheme.  As there are other provisions in the Probate Code which specify that a person could be "personally liable" to pay attorneys' fees, Lynne contends we must apply the "rule of statutory construction that 'the enumeration of things to which a statute applies is

17

presumed to exclude things not mentioned.' [()*O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423, 1443.[)]" Because the Legislature included express provisions allowing for personal liability for attorneys' fees and costs in sections 2622.5, subdivision (a), 11003, subdivision (a), and 17211, subdivision (a), Lynne asks us to determine that the absence of such a provision in section 15642, subdivision (d) demonstrates that the Legislature intended the general jurisdictional rule, allowing the court to direct the payment of fees only from the payor's share in the subject estate, to apply. Each of these statutes concerns the award of attorneys' fees where a specified person objects to or contests accountings prepared by an appointed guardian or conservator (§§ 2622, 2622.5, subd. (a)), personal representative of a decedent's estate (§§ 10950, 10951, 11003, subd. (a)), or trustee (§ 17211, subd. (a)), upon a finding that the objection was "without reasonable cause and in bad faith" (§§ 2622.5, subd. (a), 11033, subd. (a), 17211, subd. (a)). Each statute provides that the objector or contestant shall be "personally liable" for the amount ordered, although sections 11033, subdivision (a), and 17211, subdivision (a) first state that the amount will be charged against the contestant's share of the estate, leaving the contestant personally liable for any unsatisfied remainder. (§§ 2622.5, subd. (a), 11033, subd. (a), 17211, subd. (a).)

Although we respect the enumeration principle of statutory interpretation, we are not persuaded by Lynne's argument because the legislative history of section 15642 demonstrates that the addition of subdivision (d) was specifically designed to address the damage to trust estates resulting from bad faith claims. In evaluating Assembly Bill 1466, which proposed amending section 15642 to add subdivision (d), the Senate Judiciary Committee indicated, "Current law has numerous provisions for payment of attorney's fees and costs throughout the Probate Code. Where a trustee must hire an attorney for actions relating to the benefit of the trust, the payment of the fees and costs, including the attorney's fees will be charged against the trust—unless the trustee is at

18

fault. There is currently, however, no specific provision for ordering payment of fees and costs for a bad faith action to remove a trustee. This bill provides a court with the authority to order fees and costs, including attorney's fees, to be paid by a person petitioning for the removal of a trustee in bad faith." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1466 (1995-1996 Reg. Sess.) July 11, 1995, pp. 12-13.) The committee commented, "[W]here a person petitions for removal of a trustee in bad faith, it can have a significant negative impact on the trustor, the trustee, the trust and the beneficiaries of the trust. Without this additional fee provision, it is the trust, and the beneficiaries who will pay for the cost of the bad faith challenge. This could create a situation in which one beneficiary can hold up a trust and the interests of other beneficiaries by making such a challenge and forcing a settlement, without putting anything of his or her own at risk." (*Id.* at p. 13.)

Lynne argues that the Legislature intended only that a person seeking removal of a trustee put his or her interest in the trust itself at risk when asserting a claim in bad faith. We conclude that this argument is flawed. Such an interpretation could easily contravene the purpose of the statute, which is to ameliorate the impact of bad faith claims against the trust estate. The facts of this case provide an exemplar of the potential impact of a bad faith challenge brought by a person who has no personal financial stake in the outcome. Lynne argues that she does not have an actual interest in the estate, by virtue of the revocable nature of the $200,000 gift provided for her in the Trust. Thus, she effectively contends the trial court had no authority to order her to pay Respondents' attorneys' fees, even if it determined that she sought Mildred's removal as trustee in bad faith. Were that true, the Trust and its beneficiaries would be responsible to bear the costs of her bad faith challenge. As section 15642, subdivision (d) was specifically designed to prevent this outcome, we conclude that the only reasonable interpretation of the statute is that it was written to include the imposition of personal liability on a person

19

who seeks to remove a trustee in bad faith by requiring the person to pay "all or any costs of the proceeding."  (§ 15642, subd. (d).)

Lynne contends that an interpretation of section 15642, subdivision (d) which allows the trial court to impose personal liability would violate "constitutional and jurisdictional rules established by statute and case law."  She suggests that section 17003, subdivision (b) sets forth the limits of the trial court's jurisdiction, providing, "*To the extent of their interests in the trust*, all beneficiaries of a trust having its principal place of administration in this state are subject to the jurisdiction of the court under this division." (Italics added.)  But as we have discussed, the Legislature desired to protect the trust and its beneficiaries by creating an exception to this section in circumstances where a challenge is brought by a beneficiary in bad faith.  Consistent with due process, section 15642, subdivision (d) provides notice to a person seeking to remove a trustee that he or she could be liable for *all* costs of the proceeding, including attorneys' fees, and thus does not violate constitutional principles.

Lynne relies on numerous cases that do not concern the interpretation of section 15642, subdivision (d), and do not compel us to interpret the statute differently, as their holdings do no more than confirm that the trial court's jurisdiction is limited by statutory authority.  (*Miller v. Campbell, Warburton, Fitzsimmons, Smith, Mendel & Pastore* (2008) 162 Cal.App.4th 1331, 1340 [in action under section 9820, subdivision (b), the trial court does not have power to order an executor to personally compensate any attorney who has represented the executor in a personal rather than representative capacity]; *Estate of Scott* (1987) 197 Cal.App.3d 913, 918 [former section 851.5 (repealed by Stats. 1987, ch. 923, § 41) allowed an executrix of an estate to seek recovery only of assets in which the estate had an interest, rather than assets in which the executrix held a personal interest]; *Estate of Nicholas* (1986) 177 Cal.App.3d 1071, 1092 [setting

forth the general authority of the probate court as it pertains to the property of a decedent].)

Lynne also cites *Estate of Lee* (1981) 124 Cal.App.3d 687, 692 (*Lee*) in support of her contention that the imposition of personal liability under section 15642, subdivision (d) violates due process. In *Lee*, the trial court ordered the executor of a will to pay attorneys' fees rendered to the estate by its former attorney by delivery of a deed to a real property interest owned by the executor as an individual. (*Lee*, *supra*, 124 Cal.App.3d at p. 691.) Years later, the executor filed a petition to vacate the attorneys' fees order on the grounds of lack of jurisdiction, which the trial court dismissed. (*Id*. at pp. 691-692.) The appellate court determined that the order was void on its face for lack of subject matter jurisdiction over the executor's individual interest in the property, finding that "attorneys' fees in a probate proceeding are strictly statutory and do no arise from contract [citation]." (*Id*. at pp. 692-693.) Former sections 910, subdivision (a), and 911 (repealed by Stats. 1990, ch. 79, § 13), cited by the appellate court, explicitly authorized the payment of attorneys' fees "out of the estate."[11] (*Lee*, at p. 693.) The Court of Appeal held that the order requiring payment out of the executor's individual property, rather than out of the estate property, was "beyond the jurisdiction of the probate court . . . ." (*Ibid*.) But in *Lee*, no statute authorized the probate court's attorneys' fees order. Here, section 15642, subdivision (d) does.

For the reasons stated above, we conclude that under section 15642, subdivision (d), the trial court had jurisdiction to impose personal liability on Lynne for attorneys' fees and costs incurred by Respondents, such that it was authorized to order

---

[11] Former section 911 provided that "[a]n attorney who has rendered services to an estate's representative may obtain compensation by petitioning the superior court sitting in probate for an order requiring the representative to make payment to the attorney out of the estate. (§ 911.)" (*Estate of Trynin* (1989) 49 Cal.3d 868, 873.) Former section 910 set forth the method by which the court calculated the attorney's compensation. (*Ibid*.)

Lynne to pay an amount in excess of her potential interest in the Trust, assuming the other requirements of the statute were met. We now turn to Lynne's contentions in that regard.

2. *Substantial evidence supports the award under section 15642, subdivision (d).*

To award attorneys' fees to Respondents under section 15642, subdivision (d), the trial court was required to determine that Lynne filed the petition for removal of Mildred in bad faith, and that Mildred's removal as trustee would be contrary to James's intent. (§ 15642, subd. (d).) Lynne does not argue on appeal that the trial court lacked substantial evidence to find that removal of Mildred as trustee would be contrary to James's intent. Therefore, our evaluation will rest on whether there was substantial evidence to support a finding of bad faith.

Although the trial court based its analysis of Lynne's intent on her claims of forgery, Lynne now alleges the trial court could have granted the petition based on her other contentions, specifically, that Mildred failed to serve notice as required by section 16061.7 and failed to provide information about the Trust on Lynne's request. Lynne argues that substantial evidence supported these claims, which she set forth in her request to remove Mildred as the trustee of the Trust. She thus contends that she brought her petition in good faith and the trial court erred in awarding fees and costs under section 15642, subdivision (d). The sole issue heard at the court trial was whether the Trust instruments had been forged, which is one of the grounds Lynne set forth as a breach of fiduciary duty justifying the removal of Mildred as trustee. There is no indication in the record that the trial court considered Lynne's remaining challenges when it entered judgment in Respondents' favor, or that Lynne objected to the entry of judgment on the grounds that the trial court had not considered all of the causes of action raised in her amended complaint.

Lynne also did not argue in her appellant's opening brief that the trial court erred in entering judgment in favor of Respondents on her amended petition because she

22

should have prevailed on her non-forgery contentions. Nor did she claim that the court erred in awarding attorneys' fees based on a finding of bad faith because the court could have granted her petition on the non-forgery bases. Lynne focused her opening brief on her argument that the evidence did not support a finding that she brought her forgery claims in bad faith. It was not until her reply brief that Lynne alleged the trial court erred in failing to consider the potential merits of her non-forgery claims in determining that she brought her petition in bad faith. We do not consider points raised for the first time in the reply brief absent a showing of good cause for the failure to present them before. (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4.) We therefore solely consider whether there was substantial evidence to support a finding that Lynne acted in bad faith when she sought to remove Mildred as the trustee based on the allegation that the trust instruments were forged.

We review the trial court's award of fees to Respondents based on a finding of bad faith under the substantial evidence standard. (See *Powell v. Tagami* (2018) 26 Cal.App.5th 219, 234 (*Powell*) [considering a bad faith finding under section 17211, subd. (a).].) "Under the deferential substantial evidence standard of review, findings of fact are liberally construed to support the judgment or order and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings. [Citation.] 'A single witness's testimony may constitute substantial evidence to support a finding. [Citation.] It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility. [Citation.] "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." ' [Citation.]" (*Id.* at p. 231.)

Section 15642, subdivision (d) does not define bad faith. In evaluating the bad faith requirement of section 17211, subdivision (a), which authorizes the award of attorney fees where a beneficiary objects to a trustee's account and "the court determines the contest was without reasonable cause and in bad faith," the *Powell* court offered the

23

following definition: "Bad faith involves a subjective determination of the contesting party's state of mind—specifically, whether he or she acted with an improper purpose. ([*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866,] 926, fn. 47 . . .; see *Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 1263 . . . (*Gemini*) [' " 'bad faith' means simply that the action or tactic is being pursued for an improper motive" '].) ' "A subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence." ' (*Gemini*, at p. 1263. . . .)" (*Powell*, *supra*, 26 Cal.App.5th at p. 234.)

While the trial court did not explicitly find that Lynne brought the forgery claim in bad faith, an implied finding can be inferred from the trial court's statement of decision following the trial, as well as its statements made on the record at the hearing on the attorneys' fees motion in which it determined Respondents were more credible than Lynne. "The trial court sits as trier of fact and it is called upon to determine that a witness is to be believed or not believed. This is the nature of fact finding. 'The trier of fact is the sole judge of the credibility and weight of the evidence . . . .' [Citation.]" (*In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1099 (*Greenberg*).) "In that role, the judge may reject any evidence as unworthy of credence, even uncontradicted testimony. [Citation.]" (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 979.) "We do not judge credibility on appeal. An adverse factual finding is a poor platform upon which to predicate reversible error." (*In re Marriage of Boswell* (2014) 225 Cal.App.4th 1172, 1175, citing *Greenberg*, *supra*, at p. 1097.) "[T]he trier of fact may disregard all of the testimony of a party, whether contradicted or uncontradicted, if it determines that he testified falsely as to some matters covered by his testimony (*Nelson v. Black*, 43 Cal.2d 612 . . .)." (*Halagan v. Ohanesian* (1967) 257 Cal.App.2d 14, 21; accord *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 455.)

Lynne claimed that on the day she returned to the family home to see her dying father, she saw an alternative estate planning document which stated that her parents'

24

estate would be divided equally among the four daughters. She asserted that because the Trust instruments before the court did not equally divide the estate between the siblings consistent with the document she claimed to see, her mother and sisters had altered the contents of the Trust instruments. "The court did not find Lynne to be credible or her contentions to be true." The court's finding was supported by evidence that Lynne could not recall important details regarding the purported document, including whether it was a trust or will, whether it had a title, or whether it was signed. The court's finding was further supported by Mildred's credible testimony explaining that she and James planned their estate to provide for their daughters who did not have careers, and the fact that James had previously distributed stock to those daughters for that reason. The court found that Mildred was not likely to be persuaded to alter the Trust instruments to accommodate her daughters, which would have constituted a betrayal of her husband's wishes. Nor was it reasonable to conclude that one of the daughters alleged by Lynne to have engaged in the forgery would have done so, as she was an attorney with significant financial assets who would not risk her reputation or established personal security.

While the court determined Lynne had not seen an alternative estate planning document, Lynne's conduct at the time of her father's death supported the inference that Lynne had seen the Trust instruments themselves, and was concerned that she might not receive an equal share of the estate. Lynne admitted she purposefully attempted to find her parents' estate planning and financial documents while her father was hospitalized. The documents were kept in an unlocked box in a crawlspace in the closet of a guest room that would have been easily obtained for someone searching for personal documents. She displayed extreme anger at the hospital following James's death. Just after his funeral, Lynne mentioned that she was advised by her husband to hire an attorney if she did not receive "her fair share." Although Mildred testified that she had not told Lynne about the bequests, Lynne knew Gail would receive a bequest of $200,000 and attempted to use that knowledge to divide her sisters. When Mildred, through Jane,

ultimately notified Lynne of the terms of the Trust, Lynne did not express any surprise at the fact that she was receiving less than an equal share of the estate. From this evidence, it can be reasonably inferred that Lynne knew the terms of the Trust instruments, and that her frustration over the proposed distribution of the estate caused her to fabricate the existence of an alternate estate planning document.

A reviewing court does not draw *all* inferences in support of the trial court's findings, but only those that are *reasonable*. "An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600, subd. (b).) "However, '[a] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." [Citation.]' [Citations.]" (*People v. Davis* (2013) 57 Cal.4th 353, 360 (*Davis*).) Citing *Davis*, Lynne contends it is not reasonable to infer from these facts that she commenced this litigation for an improper purpose, asserting that such an inference amounts to "impermissible suspicion, imagination, speculation, supposition, surmise, conjecture, or guesswork." Her reliance on *Davis* is misplaced. In *Davis*, a jury convicted the defendant of sale and possession of a controlled substance based on the chemical name of the substance in question, without evidence showing that the substance met the statutory definition of a "controlled" substance. (*Id*. at p. 357.) The Court of Appeal affirmed the conviction, reasoning that the substance's chemical name supported an inference that the pills in question contained a controlled substance. (*Ibid*.) The California Supreme Court held that the Court of Appeal erred in finding that the jury could infer from the substance's chemical name that it was a controlled substance without any evidence supporting the inference. (*Id*. at pp. 359-360.) Unlike *Davis*, which considered an inference without any support in the evidence, here there were many

facts regarding Lynne's own conduct and statements from which the trial court could reasonably determine Lynne's subjective intent.

We similarly distinguish other cases Lynne cites that address what constitutes a reasonable inference. (Compare *Cothran v. Town Council of Los Gatos* (1962) 209 Cal.App.2d 647, 664 [the appellate court found no fact established in the record from which the trial court could infer the date of mailing of affidavits]; *Marshall v. Parkes* (1960) 181 Cal.App.2d 650, 655 [the appellate court found no evidence from which the trial court could have inferred the terms of a rental agreement]; *Estate of Braycovich* (1957) 153 Cal.App.2d 505, 512-513 [appellate court found "no evidence . . . by inference or otherwise" to support the trial court's finding that a testator was of unsound mind, stating "An inference is more than a surmise, a possibility or a conjecture; it is a reasonable deduction from the facts proved and, of course, must be logical."].) The evidence from which the trial court inferred Lynne's intent was circumstantial, but it was ample, and such evidence is appropriately considered in evaluating subjective intent. (*Powell*, *supra*, 26 Cal.App.5th at p. 234.)

Lynne contends that any circumstantial evidence of bad faith on her part is negated by her delay in filing her petition to remove the trustee. The conduct that allegedly demonstrated her bad faith took place in 2006 or 2013 and 2014, yet she waited until 2015 to pursue litigation concerning the Trust. Lynne argues that the nine-year filing delay proves that she could not have initiated the removal lawsuit in bad faith. However, the trial court could reasonably infer that Lynne purposefully delayed commencing litigation prior to receiving formal notification of the Trust. After James's death, Mildred had the ability to revoke a substantial portion of the Trust, such that she could have altered the distribution plan to Lynne's benefit as well as her detriment. Although Mildred testified that Lynne's visits to California were often unpleasant, Lynne testified that she spoke with Mildred for more than an hour every Saturday morning

27

between 2008 and 2015. The trial court could infer from this evidence that Lynne hoped to influence Mildred to alter the Trust before she died.

Citing *Orange County Water District v. The Arnold Engineering Co.* (2018) 31 Cal.App.5th 96 (*Orange County*), Lynne also argues that the trial court could not have found bad faith because she relied on her experts' conclusions. In *Orange County*, the appellate court considered whether a party should be required to pay the costs of litigation under Code of Civil Procedure section 2033.420 after failing to admit certain fact-specific requests for admission (RFA) during discovery. (*Orange County*, at p. 102.) Under Code of Civil Procedure section 2033.420, subdivision (a), the trial court can order a party who failed to admit the truth of any matter in response to a request for admission to pay the costs of proof, including attorneys' fees. (See fn. 6, *ante*.) Relevant to *Orange County*, the trial court is required to make the order unless it finds that "the party failing to make the admission had reasonable ground to believe that that party would prevail on the matter." (Code Civ. Proc., § 2033.420, subd. (b)(3).) "[W]here RFAs require sophisticated analyses of technical issues, courts are more willing to credit a party's reasonable belief that it would prevail based on expert opinion evidence. [Citation.] Courts in the past have been willing to find a party's reliance on expert opinion evidence unreasonable only where the expert opinion evidence would be inadmissible at trial [citation] *or where the expert opinion evidence was fatally undermined by facts known to the party* [citation]." (*Orange County*, at pp. 120-121, italics added.) The *Orange County* court determined the trial court abused its discretion in determining that the sanctioned party unreasonably relied on its expert's opinions. (*Id*. at pp. 122-125, 127-131.)

There is no indication in *Orange County* that the trial court made a finding that the factual contentions of the party who was ordered to pay attorneys' fees were not credible. Here, the trial court determined that Lynne had not seen an estate planning document equally dividing the estate amongst the four sisters, despite her testimony to the contrary.

28

Thus, we can infer that the trial court determined Lynne's expert opinion evidence was "fatally undermined" by Lynne's knowledge that she had not in fact viewed an alternate version of her parents' estate planning documents. (*Orange County*, *supra*, 31 Cal.App.5th at p. 121.) Lynne filed her amended petition seeking to remove Mildred as trustee before any of her experts had viewed the original Trust documents, from which the trial court could infer that Lynne had indicated to one or more of them that she had seen an alternate version of the Trust.

"Whether a party has a reasonable ground to believe he or she will prevail, in the context of requests for admissions heavily reliant on expert opinion evidence, will depend on factors within the reasonable understanding of the party. Such factors may include whether the expert has sufficient qualifications and experience to opine on the matter at issue, whether the expert's opinions will likely be admissible at trial, *whether the facts underlying the expert's opinions are supported by the evidence*, whether the expert's methodology appears reasonable, and whether the expert's analysis is grounded in logic. A party cannot rely on a plainly unqualified expert, or a sham opinion, to avoid cost of proof sanctions. [¶] Where a party's position is supported by a credible opinion from a qualified expert, the mere fact that an opposing party also has a credible opinion from a qualified expert will not in most cases preclude the party from reasonably believing it would prevail. *Something about the state of the evidence must make the party's reliance on its own expert's opinion unreasonable.* Whether a party has a reasonable ground to believe he or she will prevail necessarily *requires consideration of all the evidence*, both for and against the party's position, known or reasonably available to the party at the time the RFA responses are served. Beyond the expert opinions themselves, a party must consider other evidence, both lay and expert, that bears on the matter at issue." (*Orange County, supra,* 31 Cal.App.5th at pp. 117-118, italics added.)

Here, the trial court determined Lynne had no factual basis for her claim that the Trust documents were forged, as it found she had not seen an alternative version of

Mildred and James's estate planning documents that divided the estate equally among the daughters. Simply put, the trial court found Lynne was not credible and had fabricated the existence of a trust document with terms more favorable to herself. The existence of this document was the underlying premise for the forgery claim. Thus, it is fair to say that "something about the state of the evidence" rendered Lynne's reliance on her experts' opinions unreasonable.

We conclude, based on the trial court's credibility finding and the circumstantial evidence presented at trial, that the trial court did not err in determining that Lynne acted with an improper purpose in commencing the litigation. We affirm the attorneys' fees award under section 15642, subdivision (d).[12]

### B. Costs

Lynne argues that the trial court abused its discretion by ordering her to pay Respondents' costs based on its finding that she prosecuted an unmeritorious action. Lynne contends the record on appeal compels the conclusion that she "brought and maintained a well-founded forgery action in good faith because she was entitled, as a matter of law, to rely upon her experts' opinions." As explained above, we find these contentions are without merit. As Lynne cites no other error on the court's part in ordering her to pay Respondents' costs, we affirm the order.

### III. DISPOSITION

The attorneys' fees and costs awards set forth in the January 24, 2017 amended judgment are affirmed.

---

[12] As we affirm the order on this basis, we will not address the parties' contentions regarding the trial court's authority to award fees under Code of Civil Procedure section 2033.420.

30

_____

Greenwood, P. J.

WE CONCUR:

_____

Danner, J.

_____

Lie, J.

Bruno v. Hopkins
No. H044960

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No.: 20151PR176711 |
| Trial Judge: | The Honorable Carrie A. Zepeda |

| | |
|---|---|
| Attorneys for Plaintiff and Appellant,<br>LYNNE FRANCIS BRUNO: | Russell James Hanlon<br>Law Offices of Russell J. Hanlon |
| | Ryan Joseph Szczepanik<br>Hartog Baer & Hand |

| | |
|---|---|
| Attorneys for Defendant and Respondent,<br>JANE FRANCIS HOPKINS, Individually<br>and as Personal Representative, etc., et al.: | Raymond A. Cardozo<br>Reed Smith LLP |
| | Steven A. Ellenberg<br>Hopkins & Carley |
| | James P. Cilley<br>Temmerman, Cilley & Kohlmann, LLP |

H044960
Bruno v. Hopkins et al.